**O'NEILL, LYSAGHT & SUN, Plaintiff,**

v.

**DRUG ENFORCEMENT ADMINISTRATION, Defendant.**

No. CV–92–2798–KMW (RNBx).

United States District Court, C.D. California.

Dec. 27, 1996.

Brian O'Neill, Frederick D. Friedman, Carol K. Lysaght, O'Neill, Lysaght & Sun, Los Angeles, CA, for Plaintiff.

Nora M. Manella, U.S. Attorney, Leon W. Weidman, Assistant U.S. Attorney, Chief, Civil Division, John E. Lee, Assistant U.S. Attorney, Los Angeles, CA, for Defendant.

## ORDER GRANTING PLAINTIFF'S APPLICATION FOR AWARD OF ATTORNEYS' FEES

WARDLAW, District Judge.

This is Plaintiff's request for attorneys' fees in a Freedom of Information Act action. The underlying case ended when the requested documents were eventually disclosed, with minor redactions. The attorneys' fees debate has taken place before Magistrate Judges who have presided over settlement efforts and have referred the matter to this Court upon a determination that the parties were unable to reach settlement. The Court hereby grants the fee application, finding that Plaintiff "substantially prevailed" and has shown eligibility for and entitlement to a reasonable award of fees. Accordingly, the Court awards Plaintiff the requested amount for the reasons stated below.

## I. STATEMENT OF FACTS

### A. Factual Background

Plaintiff O'Neill, Lysaght & Sun ("OL & S") is a fifteen-lawyer law firm in Santa Monica, California. OL & S filed state and federal habeas petitions on behalf of Charles Whitt, who was convicted of murder and sentenced to death in 1985. Declaration of Carol Lysaght ¶ 1 ["Lysaght Decl."]. In Whitt's 1981 and 1985 murder trials, the key prosecution witness, Jimmy DeLoach, testified that Whitt had confided to him subsequently that he had intentionally killed the victim to eliminate all witnesses to a robbery. Plaintiff's Submission re Attorneys Fees Ex. A ["Pltf.'s Mem."]. OL & S learned that DeLoach had worked for many years as a paid informant of the Drug Enforcement Administration ("DEA"). OL & S had reason to believe that DeLoach had "committed serious and substantial misconduct while employed as a DEA informant, had abused his position ... and ... had been blacklisted by the agency on one or more occasions for his misconduct." Pltf.'s Mem. at 1. OL & S decided to seek information regarding the misconduct to undermine DeLoach's credibility in the habeas proceedings. Lysaght Decl. ¶ 6.

### B. Administrative Proceedings

On June 17, 1991, OL & S made a specific request under the Freedom of Information Act ("FOIA") to obtain certain DEA documents regarding DeLoach's misconduct as an informant. Pltf.'s Mem. Ex. A. On July 9, 1991, OL & S received a form letter response, indicating that the information could not be released without a signed and notarized waiver from DeLoach. Pltf.'s Mem. Ex. B. In a telephone conversation on July 17, 1991, DEA representative John Means told attorney Carol Lysaght that the DEA had a policy of blanket refusal for requests as to a third party without that party's consent. Lysaght Decl. ¶ 9. Lysaght contested the validity of such a policy as unlawful under FOIA requirements, but sent the DEA waiver form filled out to the best of her knowledge, indicating that DeLoach's consent had not been obtained because his whereabouts were unknown. Pltf.'s Mem. Ex. C. The letter discussed reasons why the DEA's blanket policy need not apply in this case.[1] This letter crossed in the mail with

---

1. These reasons included the facts that DeLoach had stated publicly his status as a DEA informant, that the DEA itself considered him unde-

sirable and no longer worked with him, and that a strong public interest in preventing Whitt's unnecessary execution favored disclosure of this

another DEA form letter, dated July 23, 1991, denying OL & S's request on the basis that the information was exempt from FOIA disclosure under 5 U.S.C. §§ 552(b)(7)(C) and (b)(7)(D).[2] Pltf.'s Mem. Ex. D.

OL & S had hired a private investigator who located DeLoach in a Florida prison. Lysaght Decl. ¶ 12. On July 29, 1991, Lysaght obtained a notarized waiver from DeLoach, which she sent to the DEA. Lysaght Decl. ¶ 12–13; Pltf.'s Mem. Ex. E. The DEA responded by telephone, with a message that the signature on DeLoach's waiver was "suspect," and stating that the DEA would attempt to verify it and proceed with OL & S's request if OL & S would provide it with information as to DeLoach's whereabouts. Lysaght Decl. ¶ 14; Pltf.'s Mem. Ex. G. Lysaght then executed her own declaration, as an officer of the court, stating that she had been present at and witnessed DeLoach's signing, and sent this to the DEA. She also asked that the DEA provide her with the information and samples in its records that were the basis for the suspicions as to the signature's authenticity. Pltf.'s Mem. Ex. F. The DEA responded on September 24, 1991, stating that it would handle her request expeditiously if she complied with its requests for information on locating DeLoach; otherwise, the matter was closed. Lysaght's own declaration had "no standing with DEA." Pltf.'s Mem. Ex. G.

Lysaght took an administrative appeal on December 10, 1991. Pltf.'s Mem. Ex. H. The appeal was denied on January 27, 1992, accompanied by a refusal to release the requested handwriting samples on the ground that it would merely make forgery easier. Pltf.'s Mem. Ex. I.

### C. Initiation of Lawsuit

On May 8, 1992, OL & S filed this lawsuit. Pltf.'s Mem. at 10.

On June 9, 1992, an FBI agent located DeLoach, who indicated that although his signature was in fact genuine, he now retracted his consent and asked that no documents be disclosed to OL & S. He confirmed this position by telephone on June 15, 1992. Declaration of Thomas Wingate ¶ 16 ["Wingate Decl."]. This information was "later communicated" to the DEA's FOIA section. Wingate Decl. ¶ 16.

On July 7, 1992, the DEA conducted its first computerized search for the documents requested by OL & S. Defendant's Opposition at 6 ["Def.'s Mem."]; Wingate Decl. ¶ 14. On July 28, 1992, the DEA released six pages of documents, redacted to reveal only public information, which confirmed that DeLoach had been utilized as a DEA informant, a fact previously known to OL & S. Pltf.'s Mem. Ex. J; Pltf.'s Mem. Ex A; Wingate Decl. ¶ 15.

In January 1993, the DEA filed for summary judgment, asserting that DeLoach's signature may have been valid, but that he had retracted his permission to release any documents. With the motion, the DEA submitted a Vaughn Index,[3] which OL & S claimed was inadequate. Pltf.'s Mem. Ex. L. OL & S filed a cross-motion for summary judgment, along with another notarized affidavit from DeLoach granting permission for disclosure.[4] Pltf.'s Mem. at 11; Lysaght Decl. ¶ 21. This affidavit asserted that no law enforcement officials had talked to him about changing his mind in originally grant-

---

information. The letter also recounted a perceived uncooperative attitude on the part of DEA's Means. Pltf.'s Mem. Ex. C.

**2.** These sections provide:

(b) This section does not apply to matters that are— ... (7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source.... 5 U.S.C. § 552(b)(7)(C), (D).

**3.** Under *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), an agency denying portions of a FOIA request may be required to submit a list of the withheld documents and their specific reasons for nondisclosure. The Ninth Circuit so requires. *See Wiener v. FBI*, 943 F.2d 972 (9th Cir.1991), *cert. denied*, 505 U.S. 1212, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992). The Vaughn Index battle continued throughout this litigation. *See* Lysaght Decl. ¶ 34; Pltf.'s Mem. Exs. T, U.

**4.** It is unclear where or how OL & S obtained this second affidavit.

ing consent. Pltf.'s Mem. Ex. K. Even though at this point the DEA had already taken the position that the original signature had been genuine, it now contested the validity of DeLoach's signature on the new document on the ground that it differed from DEA records in the same way that the first signature differed. Wingate Decl. ¶ 17. The DEA sent agents to talk to DeLoach again, and he again retracted his consent. Wingate Decl. ¶ 18–19; Def.'s Mem. Ex. L.

The first hearing on the summary judgment motions took place on March 15, 1993. Pltf.'s Mem. at 12. Because the status of DeLoach's consent was unclear, the court ordered a telephonic deposition of DeLoach. During the May 5, 1993 deposition, DeLoach withheld his consent. Lysaght Decl. ¶ 23; Wingate Decl. ¶ 20. The court held another hearing on the motions on July 12, 1993, and ordered the parties to engage in settlement negotiations. Lysaght Decl. ¶ 23.

## D. Legal Developments at the DEA

In May 1993, the Supreme Court announced its decision in *United States Dep't of Justice v. Landano,* 508 U.S. 165, 113 S.Ct. 2014, 124 L.Ed.2d 84 (1993), which put an affirmative burden on the government to justify a denial of information based on exemption (7)(D) for confidential informants.

On October 4, 1993, President Clinton issued a Memorandum for Heads of Departments and Agencies concerning the Freedom of Information Act. This Memorandum asked agencies to "renew their commitment to FOIA, to its underlying principles of government openness ..." and to take a "fresh look" at their FOIA administration. Def.'s Mem. Ex. N. Accompanying the Memorandum was Attorney General Reno's Memorandum rescinding the 1981 Department of Justice FOIA guidelines.[5] The Attorney General's Memorandum stated a new policy that information be withheld only pursuant to exemptions "applied with specific reference to ... harm [to governmental and private interests], and only after consideration of the reasonably expected consequences of disclosure in each particular case." The new

policy requires disclosure unless the agency "reasonably foresees" that disclosure would be harmful to an interest protected by the exemption. "Where an item of information might technically or arguably fall within an exemption, it ought not to be withheld from a FOIA requester unless it need be." Def.'s Mem. Ex. O. The Memorandum urged "discretionary disclosures whenever possible" and requested a review of the merits of all pending FOIA cases consistent with the new standard of openness described in the Memorandum. Def.'s Mem. Ex. O.

On August 5, 1994, the DEA released thirteen additional redacted pages of documents in this case, "[p]ursuant to the *Landano* decision, and the promulgation of Attorney General Reno's 'foreseeable harm' theory...." Def.'s Mem. Ex. R.

## E. Settlement Negotiations

A Joint Status Conference Report as of January 5, 1995 sets out in detail the correspondence reflecting efforts to settle this matter. Pltf.'s Mem. Ex. P; *see also* Pltf.'s Mem. Exs. M, N. At the time of that report OL & S sought a review of the additional documents by Magistrate Judge John R. Kronenberg, and thought that settlement could be reached. The DEA's position was that all non-exempt documents had been released and that further negotiation would be fruitless. Pltf.'s Mem. Ex. P. The matter went to a settlement conference before Magistrate Judge Kronenberg on February 15, 1995, and settlement efforts continued. Lysaght Decl. ¶¶ 30–34.

At a July 1995 settlement conference, the DEA agreed that it might reconsider its position if an additional declaration of consent was obtained from DeLoach. OL & S obtained this consent and sent it to the DEA on August 15, 1995. Pltf.'s Mem. Ex. V. On August 29, 1995, the DEA released the remainder of the documents. Lysaght Decl. ¶ 39, Wingate Decl. ¶ 28.

## F. Attorneys' Fees Negotiations

OL & S, considering itself to have "substantially prevailed" as required for attor-

---

5. The 1981 policy set out by Attorney General Smith had reiterated the FOIA policy of disclosure and public benefit, and stated that the Department of Justice policy would be to defend all

FOIA suits unless the denial, among other things, "lacks a substantial legal basis." Pltf.'s Reply Ex. C.

neys' fees under FOIA, 5 U.S.C. § 552(a)(4)(E), submitted its itemized bill to the DEA.[6] Pltf.'s Mem. Ex. X. The DEA took the position that the documents had not been disclosed in response to the lawsuit and thus OL & S did not substantially prevail. The DEA invited a settlement offer, but indicated it would be willing to participate in a settlement conference only if there was a "reasonable possibility of settlement," which there was not unless OL & S lowered its offer. Pltf.'s Mem. Ex. Y. OL & S maintained that its bill as submitted was a settlement offer, representing as it did the amounts to which it felt entitled.[7] This Court referred the matter to Magistrate Judge Robert N. Block for a settlement conference on February 28, 1996. This was held on September 25, 1996, following which the matter was referred back to this Court, as "incapable of being settled."

## II. LEGAL STANDARD

■ The Freedom of Information Act, designed to create greater public access to government and to ensure that government agencies perform their duties, contains a provision allowing a court to award attorneys' fees to a plaintiff who "substantially prevails" in the suit.[8] Courts consider three sets of factors in determining whether to make such an award: eligibility, entitlement, and the reasonableness of the requested fees. *Long v. United States Internal Revenue Service*, 932 F.2d 1309, 1311 (9th Cir.1991).

### A. Eligibility

■ A complainant in a FOIA action is deemed to be eligible for fees if she has "substantially prevailed" on her claim. *Long*, 932 F.2d at 1313. Eligibility requires a plaintiff to present " 'convincing evidence' that two threshold conditions have been met: he must prove that (1) his filing of the FOIA action was necessary to obtain the informa-

tion sought and (2) the action had a 'substantial causative effect' on the ultimate receipt of that information." *Long*, 932 F.2d at 1313 (quoting *Church of Scientology v. United States Postal Service*, 700 F.2d 486 (9th Cir. 1983)). Both of these determinations are matters of fact for the district court. *Church of Scientology*, 700 F.2d at 489; *Cox v. United States Dep't of Justice*, 601 F.2d 1, 6 (D.C.Cir.1979).

### B. Entitlement

■ Courts analyze four factors to determine whether an eligible plaintiff is actually entitled to attorneys' fees in the specific matter. These factors are discretionary and no one factor is dispositive. They are "(1) the public benefit from disclosure, (2) any commercial benefit to the plaintiff resulting from disclosure, (3) the nature of the plaintiff's interest in the disclosed records, and (4) whether the government's withholding of the records had a reasonable basis in law." *Long*, 932 F.2d at 1313; *Church of Scientology*, 700 F.2d at 492.

### C. Reasonableness

■ Once a court has determined that a fee award is appropriate, its only remaining discretion is as to the amount. *Long*, 932 F.2d at 1314. Traditional considerations behind awards of attorneys' fees govern this evaluation. *Exner v. FBI*, 443 F.Supp. 1349, 1354 (S.D.Cal.1978), *aff'd*, 612 F.2d 1202 (9th Cir.1980).

## III. ANALYSIS

### A. OL & S Is Eligible for Attorneys' Fees.

#### 1. The Lawsuit Was Necessary to Obtain the Release of the Documents.

##### a. The DEA Did Not Make a Good Faith Effort to Comply.

■ The DEA failed to make even a cursory effort to comply with OL & S's request

6. The initial submission to the DEA was $35,-305.13. Pltf.'s Mem. Ex. X. In this motion, OL & S seeks an award of $52,080.43. Pltf.'s Reply Ex. D.

7. The correspondence, at Pltf.'s Mem. Ex. Y, reveals a great deal of contentiousness between the parties.

8. "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E).

and the mandate of FOIA. It did not justify its nondisclosure, or investigate its own suspicions, or begin to search for and evaluate the documents requested until after the suit was filed.

In determining whether a suit was necessary and not filed prematurely, courts look at the reason for the agency's nondisclosure. An agency should be making a good faith effort to comply with a plaintiff's request, "to search out material and to pass on whether it should be disclosed." *Cox v. United States Dep't of Justice,* 601 F.2d 1, 6 (D.C.Cir.1979). If the agency does not have reasonable or actual notice of plaintiff's request, if the request is vague or unduly broad, or if the plaintiff caused an unavoidable delay through lack of due diligence, the agency may be excused from prompt disclosure. *Cox,* 601 F.2d at 6.

The DEA's assertion of a blanket policy of rejection of requests for third-party information without a waiver runs against FOIA's policy, which favors open disclosure and places the burden on the government to justify exceptions and nondisclosure. The agency should have first located and reviewed the documents, then determined whether and for which a waiver was necessary. Some of the information in DEA files about DeLoach was already public, and was disclosed shortly after the filing of the suit. Pltf.'s Mem. Ex. J.

If the DEA was solely concerned about the authenticity of DeLoach's signature, it did not make a good faith effort to confirm it. Within one month of the filing of the lawsuit, the DEA was in touch with DeLoach.[9] The DEA does not elaborate on how this came to pass, but it is indicative of how easily it could

have found DeLoach on its own.[10] The DEA apparently made no attempt to use its own samples and technology to verify the signature. *See* Wingate Decl ¶ 7. Some of the discrepancies that the DEA used to justify its suspicions of authenticity are belied by the DEA's own records as to various names and alternative spellings used by DeLoach. *See* Pltf.'s Reply Ex. A. A good faith effort, given the policy favoring disclosure, might have involved at least a cursory search for DeLoach.

Unlike other cases in which the government was earnestly attempting to comply, but had failed to do so due to administrative backlog or missing documents, the DEA from the beginning asserted a blanket position. It did not make its first computerized search for documents until after the suit was initiated. Until then it did not even attempt to search its files for the requested documents or review them at all. OL & S was therefore reasonable in believing that the filing of a lawsuit was necessary in order to induce government compliance.

#### b. OL & S Vigorously Pursued Administrative Avenues Before Filing Suit.

OL & S took full advantage of the administrative process to resolve its claim prior to filing a lawsuit, and had exhausted the process and reached an impasse before the suit was filed.

A number of cases have held that a lawsuit was premature, and therefore unnecessary, when the plaintiff was aware that the agency was attempting to comply with the request. *Weisberg v. United States Dep't of Justice,* 848 F.2d 1265, 1271 (D.C.Cir.1988) (holding

---

**9.** It appears from OL & S's filings that it may be entirely unaware of this visit. The visit undercuts the DEA's expressed need for Lysaght's cooperation in locating DeLoach. FBI agents were able to locate him without her help within one month of the initiation of the lawsuit. In addition, if he did in fact retract his consent, it seems odd that the DEA's next step would be to release six pages of documents that it had previously withheld on the very ground that it did not have DeLoach's consent. Lastly, if the DEA's ground for withholding the documents was that DeLoach's signature was forged, and it then became known that it was not forged, the DEA may have erred in giving effect to DeLoach's retrac-

tion. If it had accepted the signature as genuine in the first place, the documents would have already been released. All of this supports the notion that the DEA was, as OL & S claims, stonewalling and trying to bolster its own position of refusing to release the documents.

**10.** The notary stamp on the waiver is from the state of Florida, Pltf.'s Mem. Ex. E, so that would provide a starting point. In addition, information in the initial FOIA request indicates that he had been convicted in Florida in 1987 and 1988. Pltf.'s Mem. Ex. A. He was located shortly after the suit was filed, in Florida.

not necessary a suit filed while the government was still searching for the files and the plaintiff's requests were unduly broad); *Ginter v. Internal Revenue Serv.*, 648 F.2d 469, 473 (8th Cir.1981) (finding a suit not necessary where the government had told plaintiff it was unable to locate the records and was conducting a special search; request also broad and vague); *Vermont Low Income Advocacy Council, Inc. v. Usery*, 546 F.2d 509, 513–14 (2d Cir.1976) (holding a suit not necessary where the government sent a telegram explaining the reason for delay and its ongoing attempts to comply, and asked for plaintiff's phone number to discuss it; plaintiff filed suit the day after receiving the telegram).

OL & S vigorously pursued and exhausted its administrative remedies prior to filing suit, and so cannot be found to lack due diligence. The initial request was highly detailed and specific, including reasons for disclosure as well as what specific information was sought. The DEA was therefore on notice of the request, which was neither overly broad nor vague. Lastly, the suit was not a premature "rush to the courthouse." During the year before the suit was filed, the DEA refused all disclosure. In response to the DEA's policy requirement of a notarized waiver, OL & S attempted to comply, but was rebuffed by a decision that the signature was suspect and that Lysaght's own personal declaration as to its validity was meaningless. Correspondence indicated a likelihood of continued noncooperation.

The DEA asserts, as it did in its denial of OL & S's request and appeal, that OL & S always had an alternative to litigation—to comply with the DEA's requests to provide DeLoach's location. Certainly, OL & S's position on this point would be stronger had Lysaght provided that information, and she does not present any real reason for ignoring those requests.[11] The DEA contends that OL & S's alternative to suit was to supply the address. The DEA similarly had an alternative to refusing to disclose, however: it could have attempted to locate DeLoach for confirmation. Given FOIA's burden on the government to comply with a request or justify its refusal to comply, it would undermine that policy to require OL & S to shoulder the entire blame for the lack of confirmation.

### c. The Time Pressure of the Habeas Petitions Favored Expedited Suit.

OL & S sought the DEA records to aid in its client's habeas petitions. This created a time pressure for disclosure that mandated immediate action.

Time pressure may enhance the need for suit if the agency is not forthcoming. In *Exner*, 443 F.Supp. 1349, the plaintiff had reason to believe that incorrect information about her existed in FBI files and was being leaked to the press. *Exner*, 443 F.Supp. at 1353. She requested expedited handling of her claim, which was denied. *Exner*, 443 F.Supp. at 1350. In finding that her suit was necessary, the court stated: "She was not simply an ordinary citizen who was curious as to what information the government might have compiled on her.... [T]he leaked information ... [might have] exposed her to grave personal danger. Because of all these concerns, it was incumbent that plaintiff have an opportunity not only to review and correct the information in the FBI's files, but to do so as soon as possible. Given the government's unwillingness to give her request any sort of preferential treatment, the only way plaintiff could accomplish her goal was to bring this action." *Exner*, 443 F.Supp. at 1353. *Cf. Vermont Low Income*, 546 F.2d at 514 (suit not necessary where, among other things, there was no time constraint: "a delay of a few weeks in bringing suit involved no significant danger that the information would not be available in time ...").

The documents requested by OL & S were relevant to prove the lack of credibility of the

---

**11.** This case is distinguishable from *Vermont Low Income*, where the agency sent plaintiff a telegram stating that it was attempting to comply with his request but was experiencing a delay, and asking for his phone number to discuss the matter. The plaintiff filed suit instead, arguing later that he felt they could have called information or looked in their files if they wanted to talk to him. In *Vermont Low Income*, the agency clearly was making a good faith attempt to produce the information. *Vermont Low Income*, 546 F.2d at 513–14.

government's key witness against Whitt. A habeas petitioner generally must bring all claims at once, or they will be deemed waived. 28 U.S.C. § 2244(b)(2). Obviously, challenges to DeLoach's credibility directly impact a habeas petition. Therefore, although OL & S does not provide a timetable for the habeas proceeding, it was justified in filing suit to move the process along more quickly.

### 2. The Lawsuit Had a Substantial Causative Effect on the Production of Documents.

#### a. OL & S Has Shown a Substantial Causative Effect.

In order to substantially prevail, the documents must be produced as a result of the lawsuit. Although the DEA asserts that some of the documents were produced in response to changes in law and policy, it is clear that the filing of the lawsuit was the causative factor. The DEA had taken an uncooperative position based on a vague and weakly supported assertion of suspicion and had failed to make a good faith attempt to confirm that suspicion, which ultimately proved groundless. The lawsuit was necessary to prompt the disclosures.

■ Voluntary production of documents prior to a final judgment ordering their production does not allow the government to avoid a fee award. *See Church of Scientology*, 700 F.2d at 491; *Kaye v. Burns*, 411 F.Supp. 897, 902 (S.D.N.Y.1976) ("It is inconceivable ... that the recovery of attorneys' fees could be foreclosed whenever the government chooses to moot an action under the [FOIA] by supplying, during the pendency of the litigation, the material sought in the complaint."); *Vermont Low Income*, 546 F.2d at 513 ("Congress clearly did not mean that where [a] FOIA suit had gone to trial and developments made it apparent that the judge was about to rule for the plaintiff, the

Government could abort any award of attorney fees by an eleventh hour tender of the information requested."); *Cuneo v. Rumsfeld*, 553 F.2d 1360, 1364–65 (D.C.Cir.1977) (surveying cases that held that a surrender of documents before final judicial action did not preclude a grant of fees); *see also Cuneo*, 553 F.2d at 1365 ("The case would never have reached the status it did if appellant had not doggedly pursued the matter."); *Exner*, 443 F.Supp. at 1353 (plaintiff's "dogged determination" in a vigorous and hard-fought litigation, where the "government presented a very formidable opposition" and "[v]irtually everything the plaintiff attempted to do was vigorously opposed," showed that the lawsuit was the cause of the production).[12]

Courts may look at whether it appears that the agency noticeably stepped up its cooperative efforts subsequent to the filing of the suit. If some essentially insignificant documents were released before the lawsuit but significantly more were released due to the lawsuit, the plaintiff has substantially prevailed. "Normally, the rate of document production before and after filing a complaint is probative as to whether litigation had a significant effect on an agency's response." *Weisberg*, 848 F.2d at 1271.

The 1992 and 1995 releases plainly resulted directly from the lawsuit. (For a discussion of the 1994 release, *see infra* Part III. A.2.b.) First, the DEA was not attempting to provide the records prior to the lawsuit, as evidenced by the fact that it had not conducted a search of any kind before litigation commenced. Second, the disclosures here, while not made pursuant to a final order, were largely made during the course of court-ordered settlement negotiations. The transcript of the hearing in which the court initially ordered the parties to settlement makes clear that the court's rulings would at least partially favor OL & S.[13]

The DEA claims that only its first set of disclosures, the six redacted pages released

---

**12.** Conversely, the mere fact that documents were produced after the filing of a suit does not necessarily imply that the suit caused the disclosure. *Vermont Low Income*, 546 F.2d at 514–15 (documents were produced as soon as received by the department, which was subsequent to the suit); *Weisberg*, 848 F.2d at 1269 (upholding as not clearly erroneous a district court's finding

that the release was based on a policy change unrelated to the suit); *Cox*, 601 F.2d at 6.

**13.** *See, e.g.*, Pltf.'s Reply Ex. B, Transcript of July 12, 1993 status conference before Judge Gadbois:

THE COURT: ... I'm prepared to rule on this, and I'm going to do it very summarily. But you would save a lot of people a great deal of

in July 1992, were made in response to the lawsuit. The DEA seeks to minimize the significance of this in the "substantially prevailing" context, pointing out that the information was already public and thus insignificant.[14] The 1992 disclosure is best characterized as a first step in disclosure. That the DEA made this concession but thereafter continued to be recalcitrant should not deprive OL & S of its fees.[15]

The final disclosure was made on August 29, 1995. The DEA claims this was made, not due to the suit, but rather due to the receipt of an acceptable waiver from De-Loach. The DEA argues that it no longer had a reason to treat the waiver as suspect since it had learned he did sign the first one. This argument is specious. The DEA had possessed essentially this same waiver from almost the beginning of the entire matter, certainly well prior to the lawsuit, and only finally accepted it as valid when it was produced as a result of settlement negotiations. Moreover, the DEA had known for years that the two previously submitted waivers were in fact genuine. The DEA also asserts that a desire to end the litigation and facilitate settlement contributed to this disclosure. Def.'s Mem. at 10. This is a clear instance of voluntary release prior to court order, however, which cannot be the basis for the denial of attorneys' fees.

**b. The 1994 Release Occurred Only Because a Suit Was Pending at the Time of the Presidential Memorandum and the Attorney General's New Statement of Policy.**

The DEA contends that the second release of documents on August 5, 1994 did not

result from the lawsuit, but rather from two other precipitating events: (1) the May 1993 United States Supreme Court decision in *United States Dep't of Justice v. Landano,* 508 U.S. 165, 113 S.Ct. 2014, and (2) the changes in the policy of disclosure under FOIA by the new administration in October 1993. Although the DEA so represented when it disclosed the documents in August 1994, this Court finds that but for the pendency of this lawsuit, the DEA would not have reevaluated and disclosed the withheld documents.

It is true that *Landano* significantly altered the burden of nondisclosure of documents under 5 U.S.C. § 552(b)(7)(D). In *Landano,* the FBI had withheld documents regarding information on a crime submitted by various witnesses, claiming an exemption under exception (7)(D), which protects information that would impact a confidential source. In May 1993 the Supreme Court announced that the FBI could not assert a presumption of confidentiality for all informants such that the information was automatically protected by the exemption, putting the burden on the government to prove that an exemption applies to the specific situation, or at least that it was reasonable in believing so.

This decision plainly was not the precipitating factor for the August 1994 disclosure. Although the August 5, 1994 transmittal letter expressly states that it took both *Landano* and the policy change to prompt the second release, Def.'s Mem. Ex. R, the DEA did not take any action in this case in response to *Landano* until after the policy

---

trouble by giving them most of what you've got, because given the affirmance rate [in habeas cases] at the California Supreme Court level, it's going to come here, and when it comes here, believe me you're going to disgorge every single bit of it. I solemnly assure you of that. And for the DEA to be intransigent about this doesn't make any sense.

Transcript at 37; *see also* transcript at 38 ("the Government is spinning its wheels delaying the inevitable"); transcript at 40:

THE COURT: ... [I]f the DEA really has an interest in FOIA, they'd be well advised to accommodate [Plaintiff], because they might make bad FOIA law in regard to some rulings

I would make in this thing. The rulings .. [are] not all going to come down on [Plaintiff's] side, but some of them will.

**14.** OL & S's characterization of the information in the six-page disclosure varies. In its initial submission, it trivializes the contents, Pltf.'s Mem. at 10, but in its Reply, it treats the information as very important. Pltf.'s Reply at 12.

**15.** The DEA's position on the 1992 disclosures also undermines the validity of its previous refusal to release any documents at all, further discrediting its necessity arguments now.

change was announced in the Presidential Memorandum. The *Landano* decision itself only addressed exemption (7)(D), while the DEA here refused to disclose under both (7)(C) and 7(D). Therefore, this Court concludes that the principal motivating factor for the release was the new directives issued by the President and the Attorney General.

The new approach imposed a presumption of disclosure unless the agency could reasonably foresee harm to a protected interest and requested that agencies review *pending* cases. The DEA claims here that pursuant to the new policies and the required review of *pending* cases, it reevaluated the withheld documents and determined that thirteen additional redacted pages released in August 1994 could be disclosed.

This argument, however, only further bolsters OL & S's position. The new directive plainly requested, and the DEA understood, that *pending* cases be reviewed for compliance with the Memorandum's new standards. The key to the DEA's second release was that OL & S did not accept the results of the administrative process and instead filed suit. That the suit was pending at the time of the new directives is the reason the request was eligible for reevaluation.

Finally, it is important to bear in mind that the DEA had contested the disclosure of these documents up to the point where it was evident that it would be ordered to disclose. The DEA was able to reevaluate the documents and decide to release them. This situation seems comparable to the situation courts have cautioned about: voluntary government disclosure prior to a court judgment. It cannot be ignored that the DEA had already essentially been ordered to produce.

Therefore, the lawsuit caused the events that prompted the DEA to concede that the valid signature did not justify withholding some of the documents, and to reevaluate its refusal to disclose others.

**B. OL & S Is Entitled to Attorneys' Fees.**

▇▇ After considering the relevant factors, the Court also finds that OL & S is entitled to an award of attorneys' fees. *See Church of Scientology*, 700 F.2d at 492.

**1. There Is a Public Benefit From Disclosure of the Documents.**

▇▇ Disclosure of DeLoach's relationship with the DEA benefits the public by focusing attention on the use of paid informants by law enforcement. The public benefit factor recognizes that a benefit to the public furthers FOIA's purpose to encourage government performance of its statutory functions. That the particular documents disclosed will be used solely for a private purpose is not dispositive. The information need not be of public interest as long as there is a public benefit from the fact of its disclosure. *Church of Scientology*, 700 F.2d at 493. Courts look to the dissemination and public impact from disclosure. Courts also consider whether the release of the information contributes to the fund of information at the disposal of citizens to make important political choices. *Ellis v. United States*, 941 F.Supp. 1068 (D.Utah 1996).

In *Church of Scientology*, the court found a public benefit existed simply from the fact that the case resulted in a ruling that a certain statute did not exempt documents under FOIA. *Church of Scientology*, 700 F.2d at 493. In *Cuneo*, the court found a public benefit in the fact that a successful FOIA litigant has served the purposes of FOIA by forcing government compliance. *Cuneo*, 553 F.2d at 1366. An example of a purely private benefit is in *Lovell v. Alderete*, 630 F.2d 428, 432 (5th Cir.1980), where a prison inmate sought release of a copy of his eyeglasses prescription.

DeLoach's conduct over a period of years as a DEA informant reveals a long history of abuse that eventually resulted in his blacklisting as an informant. Disclosure reveals both the abuse and the process to the public. OL & S has submitted a New York Times article and a study by the Los Angeles County Grand Jury examining problems with law enforcement informants, to illustrate the public interest and the impact on the integrity of the criminal justice system. Pltf.'s Mem. Exs. R and Z. The DEA characterizes the likelihood of dissemination or impact as

small, claiming that undermining DeLoach's credibility only impacts Whitt's case and nothing else. This argument ignores the broader purpose served by the disclosure. Although the information about DeLoach's credibility is sought for the specific benefit of Whitt's habeas petitions, OL & S asserts a public benefit from preventing unwarranted executions. Under *Church of Scientology,* there is a broader public benefit in exposing the implications of the government dealing with untrustworthy paid informants.

### 2. There Is No Commercial Benefit to OL & S.

OL & S has derived no significant commercial benefit from the disclosures at issue.

The fee award section of FOIA creates a financial incentive to bring a FOIA suit. Where a sufficient economic incentive to pursue the claim otherwise exists, an award of fees is usually found unnecessary. *Church of Scientology,* 700 F.2d at 494; *United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Industry, Local 598 v. Department of the Army,* 841 F.2d 1459, 1461 (9th Cir.1988) [*"Local 598"*] (indicating that where there is no commercial benefit, that factor should not be ignored, but should ·be weighted in favor of a fee award [16]). If there may be a commercial benefit but it is remote or unlikely, then a court may presume that fees are a necessary encouragement. *Local 598,* 841 F.2d at 1462.

OL & S is a for-profit law firm that seeks to recover fees for at least some of the time spent on this effort. Although the DEA makes much of its for-profit nature and the inherent commercial motivation in benefiting clients, here any commercial benefit seems negligible.[17] OL & S represents an indigent death row inmate in this case, and claims to

have already lost thousand of dollars on his case. Pltf.'s Reply at 23. OL & S also stresses its commitment to helping death row clients as its motivation, not the money. It is extremely unlikely that OL & S has been motivated by or will receive any commercial benefit from its five-year quest for the documents here released.

### 3. The Nature of OL & S's Interest Favors a Fee Award.

The nature of OL & S's interest in the disclosed records is neither private nor personal. Nor is this suit either commercial or frivolous; OL & S seeks to vindicate a death row inmate's constitutional rights. Therefore, the nature of OL & S's interest favors an award of attorneys' fees. *Church of Scientology,* 700 F.2d at 494; *Local 598,* 841 F.2d at 1462. "If either commercial benefit will inure to the plaintiff from the information or plaintiff intends to protect a private interest ... an award· of attorney's fees is not recoverable. On the other hand, where plaintiff is indigent or a nonprofit public interest group, an award of attorney's fees furthers the FOIA policy of expanding access to government information." *Church of Scientology,* 700 F.2d at 494; *see also* S.Rep. No. 854, 93d Cong., 2d Sess. 19 (1974), *quoted in Long,* 932 F.2d at 1316 (" 'Under the third [entitlement] criterion a court [sh]ould generally award fees if the complainant's interest in the information sought was scholarly or journalistic or public-oriented, but would not do so if his interest was of a frivolous or purely commercial nature.' ").

The DEA argues that FOIA was not intended to be a "discovery vehicle" for litigation, and that OL & S only wants access to this information to support its client's habeas petitions. Although cases have stated that

---

**16.** *Local 598* may have been abrogated as to its determination that the policy of federal labor laws is a public benefit outweighing private interests by *United States Dep't of Defense v. Federal Labor Relations Auth.,* 510 U.S. 487, 497–99, 114 S.Ct. 1006, 1014, 127 L.Ed.2d 325 (1994), as recognized by *Painting Industry of Hawaii Market Recovery Fund v. United States Dep't of the Air Force,* 26 F.3d 1479, 1484 n. 5 (9th Cir.1994).

**17.** In *Cuneo,* the plaintiff's client was a group of corporate government contractors, and plaintiff

"felt disclosure of the Manual would benefit the commercial interest of his clients and in turn his law practice, and thus he instituted a suit to obtain the Manual." Therefore, the commercial motivation would seem to be paramount. Yet the court did not even discuss commercial interest, and awarded fees, finding that "most successful FOIA actions result in the vindication of important congressional policies and confer important benefits on the public generally." *Cuneo,* 553 F.2d at 1367.

using FOIA access solely for purposes of discovery for private benefit in litigation is contrary to FOIA's purpose, none of the cases cited by the DEA is apposite.[18]

### 4. The DEA Had No Reasonable Basis in Law for Nondisclosure.

■ The DEA lacked a reasonable basis in law for withholding the documents. Its initial decision to withhold documents was based entirely on its blanket policy requiring third-party waiver; it did not even check to see what was in the documents and whether DeLoach's privacy would indeed be impacted. The Court cannot find that such conduct is consistent with the presumption toward disclosure. It plainly does not satisfy the burden of showing a reasonable basis in law. "Exemption (6) protects only against disclosure which amounts to a 'clearly unwarranted invasion of personal privacy.' That strong language 'instructs us to "tilt the balance [of disclosure interests against privacy interests] in favor of disclosure." ' " Local 598, 841 F.2d at 1463 (quoting Washington Post Co. v. Department of Health and Human Services, 690 F.2d 252, 261 (D.C.Cir.1982)).[19]

In discussing the withholding of documents under FOIA exemption 6, the court in Local 598 held: "[T]here is a strong presumption in favor of disclosure that must be indulged not only by the courts, but as well by the agency in its initial determination whether to disclose. Thus the agency's decision must be based upon legal authority that reasonably supports its position that the documents should be withheld. An agency may not refuse to disclose requested documents simply because no prior authority affirmatively requires disclosure under the circumstances." Local 598, 841 F.2d at 1463.

Cuneo cautions that this factor in particular should not be considered dispositive; therefore it is possible for a court to find a reasonable basis in law but still weight the other factors in favor of an award. Cuneo, 553 F.2d at 1365–66. "What is required [to meet this fourth factor] is a showing that the government had a reasonable basis in law for concluding that the information in issue was exempt and that it had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior." Cuneo, 553 F.2d at 1366; see also Kaye, 411 F.Supp. at 904 (the burden of establishing exemption rests with the agency and exemptions should be narrowly construed); Local 598, 841 F.2d at 1463.

■ The DEA claims that the government needs merely a "colorable" argument to meet this prong, and that any information covered by a FOIA exception always has a reasonable basis in law. Church of Scientology, 700 F.2d at 494. But the burden is on the government to show that information does fit under that exemption. The DEA also claims that its suspicions regarding the signature made the nondisclosure reasonable, but this is not a reasonable basis in law; at best, it is a policy of questionable validity under FOIA as it skirts the government's burden.

The government was in fact recalcitrant and arbitrary, and had no reasonable basis to conclude the documents were exempted because it made no effort to locate or review them prior to refusal.

### C. The Fees Requested Are Reasonable

Once the entitlement to a fee award is established, a court must award fees, limited

---

**18.** In Muffoletto v. Sessions, 760 F.Supp. 268 (E.D.N.Y.1991), the court held that seeking private discovery alone is an insufficient interest for a fee award if the sole purpose of the request is to aid in private civil litigation. Here, an additional purpose is public exposure of flaws in the use of paid informants. Muffoletto also stated that if an agency is refusing to disclose information, there may be a public benefit in merely forcing it to comply, and therefore fees can be awarded for the deterrent effect. Muffoletto, 760 F.Supp. at 276; see also Republic of New Afrika v. FBI, 645 F.Supp. 117, 120 (D.D.C.1986) (discovery is a private interest, but information add-

ing to the fund of citizen information is a legitimate public benefit); Simon v. United States, 587 F.Supp. 1029, 1032 (D.D.C.1984) (purely personal interest where plaintiff sought release of her own personnel files).

**19.** Section (b)(6) excepts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 is analogous to exemption 7(C), because both protect against unwarranted invasions of personal privacy.

by their reasonableness under the factors traditionally considered in evaluating fee awards. *Long*, 932 F.2d at 1314; *Exner*, 443 F.Supp. at 1354. These factors include "time spent by attorney; novelty and complexity of the issues presented; level of skill required; customary fee charged by attorney or firm; experience, reputation, and ability of attorney; and awards in similar cases." *Exner*, 443 F.Supp. at 1354. The plaintiff submits a lodestar figure, which the court has the discretion to adjust. If the hours and charges are reasonable, the lodestar is presumed reasonable. *Long*, 932 F.2d at 1314. OL & S has met this standard: its rates charged were reasonable, and the total amount of fees requested is reasonable in light of the facts that the litigation continued for four years and that the desired result, disclosure of all documents, was achieved. While the litigation certainly took more time than should have been needed to address this matter, the length of time is due solely to the recalcitrance and resistance of the DEA.

 The hourly rates charged by OL & S are reasonable.[20] The DEA incorrectly argues that FOIA awards require that lawyers bill at reduced rates. In *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1524 (D.C.Cir.1988), the D.C. Circuit held it unfair to require private law firms who took on indigent clients at lower than usual rates to be bound to those rates in a fee award. Rather they could charge their time at the prevailing market rate for attorneys in their market. In *Exner*, the attorney charged at his prevailing rates and the court found them reasonable. *Exner*, 443 F.Supp. at 1354. In any event, attorneys Lysaght and Friedman did bill at reduced rates.

The DEA also challenges the number of hours, claiming that the total is unreasonable given that the case settled before trial and no significant litigative effort was ever involved. The DEA claims that two principal attorneys need not have been involved, that they effectively double-billed their time for meetings where both were present, that some of the time was spent at the administrative level, and that overall the amount was too high when the end product was only 21 pages of information.[21] However, the time spent largely results from four years of litigation, much of it made necessary only by the DEA's conduct. The DEA cannot prolong the litigation through its own obdurate behavior and then protest that OL & S has spent too much time prosecuting the action.

## IV. CONCLUSION

The Court hereby **GRANTS** OL & S's fee award application. The Court finds that OL & S is eligible for and entitled to a fee award, and that the requested fees are reasonable. The DEA is ordered to pay to OL & S attorneys' fees in the amount of $52,080.43.

**IT IS SO ORDERED.**

---

20. Attorney Carol Lysaght billed her time on this case at $200 per hour. Her regular rate is $250. Attorney Frederick Friedman billed his time at $225 per hour. His regular rate is between $250 and $275. Lysaght Decl. ¶¶ 48, 49. Both attorneys have submitted declarations attesting to their experience and qualifications.

21. *See supra* note 3 for a discussion of the problems with the Vaughn Index.

# Los Angeles
# Daily Journal

TUESDAY,
JANUARY 14, 1997

# DEA Ordered To Pay $52,000 In Legal Fees

### By Martin Berg
Daily Journal Staff Writer

When he testified against Charles Whitt, convicted felon Jimmy DeLoach portrayed himself as a trusted informant for law enforcement, including the U.S. Drug Enforcement Administration.

With DeLoach's help, San Bernardino prosecutors obtained the death penalty against Whitt for the murder of a popular college professor and swimming coach.

That was more than 10 years ago.

After Whitt's appellate lawyers began to suspect that DeLoach was not exactly as he portrayed himself, they filed a Freedom of Information Act request in 1991 with the federal anti-drug agency.

They wanted documents.

The DEA offered one objection after another to the release of information about DeLoach, though the agency released several pages of documents, many of which were heavily redacted, defense attorneys said.

### Documents Released

After three years of often contentious litigation, the DEA handed over 22 pages of documents related to the informant.

Among the disclosures contained in the information was that in 1984, the year before DeLoach was testifying that he was a trusted DEA informant, the DEA had blacklisted him as an informant—after he allegedly ripped off the agency's own money, according to the DEA documents.

Late last year, in an opinion sharply critical of the DEA, a federal judge ordered the agency to pay Whitt's attorneys, the Santa Monica law firm of O'Neill, Lysaght & Sun, legal fees of $52,000. *O'Neill v DEA*, 92-2798-KMW.

U.S. District Court Judge Kim Wardlaw ruled that the DEA "lacked a reasonable basis in law for withholding the documents."

### 'Stonewalling' Charged

The judge said the evidence of the DEA's actions supported the criminal defense attorneys' contention that the agency was "stonewalling." She ruled the DEA was "recalcitrant and arbitrary" in opposing release of information about DeLoach.

Calls to the government lawyer who represented the DEA in the case, Assistant U.S. Attorney John Lee, were referred to a spokesman for the U.S. attorney's office, who said the DEA had acted appropriately.

"The office is considering filing an appeal, but a decision on that won't be made until we fully analyze the judge's written ruling," said spokesman Thom Mrozek. "We think DEA acted properly, which is why we decided to litigate the case."

Mrozek declined comment on any details of the case. A spokesperson for the DEA in Washington, D.C., also declined comment.

But Whitt's attorney, Carol Lysaght of O'Neill, Lysaght & Sun, said Wardlaw's ruling was "fantastic," and said it should cause government agencies to take the Freedom of Information Act more seriously. She also said the case illustrates possible dangers in recent efforts to speed up the habeas corpus process in death penalty appeals.

"Under the new habeas law, it's possible that the habeas petition on Whitt's behalf would have had to be filed while another government agency dragged its

See Page 8 — DEA

1428

# DEA Told To Pay for Data Delay

Continued from Page 1

feet on releasing absolutely crucial evidence," Lysaght said. She plans to use the information in preparing Whitt's new habeas petition.

So who was Jimmy DeLoach?

In legal papers filed by the U.S. attorney's office in opposition to the request for legal fees, Lee minimized DeLoach's misdeeds as "innocuous — passing bad checks, not paying bills."

But in her response, Lysaght wrote, "the long withheld files actually show that DeLoach has repeatedly abused his very relationship with law enforcement, and incredibly, that the DEA sought to continue to utilize the informant even after his crimes were discovered, resulting in his formally being blacklisted by the agency. DeLoach committed crimes in 1984 [before his testimony in Whitt's case] while serving as a DEA informant ... including stealing money provided to him for use in connection with [a South Carolina sting operation known as Operation Palmetto] and then writing bad checks for Operation Palmetto expenses."

Throughout the litigation, the DEA offered a variety of reasons for its refusal to turn over information about DeLoach.

When first confronted with the request for information in June 1991, the DEA said it wouldn't release information without the informant's permission in order to protect his privacy.

When the defense lawyers obtained what they said was a signed waiver from DeLoach, DEA officials said they thought the signature had been forged. Lysaght told the DEA she had seen DeLoach sign the waiver, but that didn't budge the DEA.

Among the reasons the DEA offered for suspecting the signature was a forgery was that "Mr. DeLoach's first name was written 'Jimmy,' whereas the known true signature were [sic] written 'Jimmie' or 'James,'" the DEA contended in legal papers.

In addition, the signature contained a capital L while DeLoach "was known to have not capitalized this letter" and he included the name Lee and used different penmanship.

In her response, Lysaght labeled the DEA's argument "astonishing." The Freedom of Information Act does not permit such "blanket rejection" of information requests based on personal privacy, she said.

Also, a glance at DeLoach's rap sheet revealed that one of his six aliases was "Jimmy Lee DeLoach," Lysaght argued. In addition, if the DEA suspected the signature was a forgery, she questioned why the agency never submitted the handwriting for analysis.

Authorities also said they couldn't find DeLoach, whom defense attorneys had found in a Florida prison. They asked Lysaght for help. The attorney declined.

Instead, she filed a lawsuit challenging their refusal to turn over documents.

A month after the suit was filed, DEA agents found DeLoach, according to Wardlaw's ruling. When DEA officials finally tracked the informant down, they said DeLoach reversed his earlier waiver, retracting permission for the agency to release information about him.

In her ruling, Wardlaw rejected the DEA's explanations. In a footnote, the judge noted contradictions in the DEA's responses.

"The visit [by DEA agents to DeLoach] undercuts the DEA's expressed need for Lysaght's cooperation in locating DeLoach," Wardlaw wrote. After DeLoach retracted his consent for release of information about him, "it seems odd that DEA's next step would be the release of six pages of documents it had withheld on the very ground that it did not have DeLoach's consent."

Criticizing the DEA, the judge wrote: "All of this supports the notion the DEA was, as [Lysaght] claims, stonewalling and trying to bolster its own position of refusing to release the documents."

The DEA opposed granting Lysaght legal fees, arguing that the documents were turned over because of unrelated court decisions and a new Justice Department FOIA policy. In addition, the DEA contended that Lysaght's firm sought the information for a "nonpublic purpose," and stood to gain financially from the release of the documents.

"Attempting to obtain damaging evidence against a key witness in the hopes of strengthening the habeas petition of an individual inmate" is not the purpose for which FOIA was intended, argued Assistant U.S. Attorney John Lee in legal briefs.

But Wardlaw rejected that argument, saying "none of the cases cited by the DEA is apposite."