The LOS ANGELES GAY & LESBIAN
COMMUNITY SERVICES
CENTER

v.

IRS.

No. CV 06–6122 DSF (FMOx).

United States District Court,
C.D. California.

March 12, 2008.

Dean Hansell, Mark Joseph Nagle, Dewey and LeBoeuf, Dorothy L. Black, LeBoeuf Lamb Greene & MacRae, Los Angeles, CA, for The Los Angeles Gay & Lesbian Community Services Center.

Gerald A. Role, R. Scott Clarke, US Department of Justice, Washington, DC, Thomas D. Coker, AUSA-Office of US Attorney, Los Angeles, CA, for IRS.

DALE S. FISCHER, District Judge.

This matter is before the Court on Plaintiff The Los Angeles Gay and Lesbian Community Services Center's Motion for Attorneys' Fees and Litigation Costs. By its motion, Plaintiff seeks $296,033 in fees and $2,256.10 in costs incurred obtaining documents from Defendant Internal Revenue Service ("IRS") through this lawsuit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. After considering the parties' briefs and having heard the oral argument of counsel, the Court GRANTS Plaintiff's Motion.

## I. FACTS

On January 10, 1973, Defendant denied Plaintiff Los Angeles Gay and Lesbian Community Services Center's application for 501(c)(3) tax-exempt status. (Aug. 27, 2007 Order DENYING Def.'s Mot. for Summ. J. 1.) Plaintiff has submitted evidence, which Defendant does not controvert, that Plaintiff's application for tax-exempt status was the first such application submitted by an openly gay organization, and that the application therefore received heightened scrutiny within the IRS. (*See id.*) For example, Plaintiff was advised by a letter dated September 15, 1972 that its application "involv[ed] a complex issue which requires careful consideration by the service." (*Id.*) The application was subsequently referred to the IRS's National Office for ruling. (*Id.*) By a letter dated February 22, 1972, the IRS

sent Plaintiff a request for additional information, asking whether "a substantial portion of [Plaintiff's] activities involve the providing of social activities to homosexu- ·als." (*Id.*) Subsequent letters made similar requests. (*Id.*)

Plaintiff reapplied for, and was eventually granted, tax-exempt status, but only after unusual processing, including review by the IRS Commissioner. (*Id.* at 2.) In April 1973, Plaintiff's then-counsel, C. Edward Dilkes, attended a hearing before Defendant in Washington, D.C., at which Plaintiff's executive director was questioned about whether Plaintiff advocated homosexuality, recruited young people to become homosexual, or advocated for homosexual candidates to be elected to office. (*Id.*) According to Dilkes, the then-Commissioner of the IRS attended this hearing. (*Id.*)

Pursuant to FOIA, by letters dated March 21, 2005, sent to IRS offices in Cincinnati, Ohio ("Cincinnati Office"), Ogden, Utah ("Ogden Office"), Fresno, California ("Fresno Office"), Laguna Niguel, California ("Laguna Office"), and Washington, D.C. ("Washington Office"), Plaintiff requested documents related to its initial denial of tax-exempt status, as well as its later grant and reissuance. (*Id.*)

Plaintiff received no responsive documents from Defendant prior to filing its Complaint on September 26, 2006.(*Id.*) The Ogden, Fresno, and Laguna Offices responded to Plaintiff's counsel by letters indicating that they had referred the request to the Cincinnati Office and would take no further action. (*Id.*) After initiation of the present lawsuit, Defendant conducted searches at the Cincinnati and Washington Offices. (*Id.* at 3.) A search of microfiche records at the Washington Office located 29 pages of responsive documents, which were sent to Plaintiff's counsel. (*Id.*) Portions of some of these docu-

ments were redacted pursuant to FOIA exemptions. (*Id.*)

On July 9, 2007, Defendant filed a Motion for Summary Judgment, seeking judgment that its search efforts complied with the requirements of FOIA. On August 27, 2007, the Court issued an Order DENYING Defendant's Motion for Summary Judgment, finding that Defendant had not conducted a reasonable search sufficient to satisfy its obligations. At the August 27, 2007 hearing on the motion for summary judgment, the Court ordered Defendant to conduct additional searches for Plaintiff's requested documents pursuant to a joint stipulation to be entered into by the parties. After nearly two months of negotiation, the parties filed a joint stipulation on November 15, 2007. No further responsive documents were located.

## II. DISCUSSION

■ FOIA provides that a "court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). "If the facts show that the plaintiff has substantially prevailed on his or her FOIA action, then such party is eligible for an award of attorney's fees. A determination of eligibility does not automatically entitle the plaintiff to attorney's fees. Entitlement to attorney's fees is left to the discretion of the district court." *Church of Scientology of Cal. v. U.S. Postal Serv.*, 700 F.2d 486, 489 (9th Cir.1983) (internal citations omitted).

### A. Eligibility for Fees

The Ninth Circuit has held that "[t]o be eligible for an award of attorney's fees in a FOIA suit, the plaintiff must present convincing evidence that two threshold conditions have been satisfied. The plaintiff

must show that: (1) the filing of the action could reasonably have been regarded as necessary to obtain the information; and (2) the filing of the action had a substantial causative effect on the delivery of the information." *Id.* In a case not involving FOIA, however, the Supreme Court rejected the "causative effect" standard for determining whether a party is a prevailing party and held that a party may only receive an award of fees where it obtained a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health Res.*, 532 U.S. 598, 605, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

The Court need not resolve which standard applies here, as the parties agree that Plaintiff is eligible for fees under either standard. Defendant did not begin to search for documents until Plaintiff filed its Complaint, a year and a half after it submitted its FOIA request. Even when Defendant conducted its search, that search was unreasonably limited. Defendant only stipulated to an adequate search protocol when the Court ordered it to do so. Thus, this action was both reasonably necessary and had a "causative effect" on the delivery of the information. In addition, the court-ordered stipulation between the parties altered their legal relationship. Plaintiff is eligible for fees.

**B. Entitlement to Fees**

 Defendant contends, however, that Plaintiff is not entitled to fees. "The legislative history of FOIA makes it clear that Congress did not intend an award of attorney's fees to be automatic; rather, the trial court must weigh the facts of each case against the criteria of the existing body of law on the award of attorney fees and then exercise its discretion in determining whether an award is appropriate." *Church of Scientology*, 700 F.2d at 492

(internal quotation omitted). "In the exercise of this discretion, the court may take into account whatever factors it deems relevant in determining whether an award of attorney's fees is appropriate." *Id.* (internal quotation omitted). Among these factors are "(1) the benefit to the public, if any, deriving from the case; (2) the commercial benefit to the complainant; (3) the nature of the complainant's interest in the records sought; and (4) whether the government's withholding of the records sought had a reasonable basis in law." *Id.* However, "[t]hese four factors are not exhaustive." *Id.* Moreover, "the criteria listed in the Senate Judiciary Committee's Report on the Freedom of Information Act should be considered in conjunction with the existing body of law on the award of attorney's fees." *Id.*

**1. Benefit to the Public**

"Under the first criterion a court would ordinarily award fees ... where ... a publication or a public interest group was seeking information to further a project benefiting the general public, but it would not award fees if a business was using the FOIA to obtain data relating to a competitor or as a substitute for discovery in private litigation with the government." *Id.* at 492 n. 6 (citing S.Rep. No. 93–854 (1974)).

Plaintiff is a tax-exempt public interest organization. It sought documents regarding the IRS's initial denial of its tax-exempt status in order to educate the public about its struggle to become the first openly gay organization to obtain tax-exempt status from the IRS, as well as to inform the public about Defendant's treatment of homosexual groups during the 1970s and 1980s. Information regarding the historical relationship between openly gay organizations and the government puts into context the contemporary politi-

cal needs and initiatives of such groups. Such information informs current understanding of policies that affect homosexuals and undoubtedly "contributes to the fund of information at the disposal of citizens to make important political choices." *See O'Neill, Lysaght & Sun v. Drug Enforcement Admin.,* 951 F.Supp. 1413, 1423 (C.D.Cal.1996); *Cazalas v. U.S. Dept. of Justice,* 709 F.2d 1051, 1053–54 (5th Cir. 1983) (holding that documents related solely to discrimination against an individual had public value).[1]

Defendant maintains that there was no public benefit from the disclosure of documents to Plaintiff because (1) the IRS's decision in 1973 to deny Plaintiff tax-exempt status merely reflected the generally held cultural, psychological, and legal view at the time that homosexuality was "pathological" and "deviant" (Opp'n 4–5); (2) similar treatment of other gay organizations is already documented by records available to the public; and (3) in any event, the search only located documents regarding a reissued 1989 letter granting it tax-exempt status, not the initial denial or issuance of that status.

The first argument hardly warrants response. That the IRS's discriminatory actions may have reflected the views of society at the time in no way diminishes the public value of having those actions documented. Indeed, it is Plaintiff's struggle against such prevailing societal views that Plaintiff seeks to document. Whether or not the IRS's decision reflected the views of society at the time, the decision is evi-

dence of the historical relationship between the government and gay organizations. This is clearly a matter of public concern.[2]

That there is other publicly-available documentation demonstrating that the IRS imposed unusual restrictions on homosexual groups that sought tax-exempt status does not diminish the public benefit conferred by documentation of Plaintiff's treatment. The documents Defendant relies on provide only limited insight into Defendant's policies. In addition to being limited to only two groups, they do not document the type of long-lasting difficulty Plaintiff faced. The documents produced to Plaintiff thus contribute to a more thorough understanding of the relationship between the IRS and homosexual groups. Moreover, because Plaintiff was the first openly gay organization to obtain tax-exempt status, its treatment has unique historical significance.

Finally, Defendant's success in finding responsive documents is not as limited as it suggests. Defendant attempts to minimize the import of the produced documents by noting that they pertain to reissuance of Plaintiff's tax-exempt status in 1989, not the initial denial or grant of Plaintiff's status. However, the documents produced include internal IRS correspondence describing the conditions imposed on Plaintiff as "silly," "dumb," and lacking legal foundation. (Supplemental Decl. of Mark Nagle in Supp. of Pl. The L.A. Gay and Lesbian Cmty. Servs. Center's Reply to Opp'n to Pl.'s Att'ys' Fees

---

1. Underscoring the public nature of this information, counsel for Plaintiff has been contacted by researchers regarding the documents produced, and the press has covered this litigation. (*See* Supplemental Decl. of Dean Hansell in Supp. of Pl. The L.A. Gay and Lesbian Cmty. Servs. Center's Reply to Opp'n to Pl.'s Att'ys' Fees and Litig. Costs ¶¶ 6–7, Ex. 1.)

2. In this respect, Defendant's apparent claim that society's views somehow excuse its past conduct is irrelevant. The information is of public value because it documents the relationship between Plaintiff and its government.

and Litig. Costs Ex. 1 at 00010, 00012.) They also reveal that Defendant considered sanctions for Plaintiff's failure to comply with those conditions, and that its employees hoped that Plaintiff would withdraw its request to have those conditions removed. (*Id.* Ex. 1 at 00012.) In addition, even if the production was limited, Plaintiff's legal action had public benefit in that it enforced Defendant's compliance with FOIA with regard to a search of public value. *See O'Neill, Lysaght & Sun*, 951 F.Supp. at 1423 ("In *Cuneo*, the court found a public benefit in the fact that a successful FOIA litigant has served the purposes of FOIA by forcing government compliance."); *LaSalle Extension Univ. v. Fed. Trade Comm'n*, 627 F.2d 481, 484 (D.C.Cir.1980) (holding that attorneys' fees provision is intended to "encourage Freedom of Information Act suits that benefit the public interest" and to compensate plaintiffs for "enduring an agency's unreasonable obduracy in refusing to comply with the Freedom of Information Act's requirements.")

The public benefit factor weighs in favor of granting attorneys' fees.

### 2. Commercial Interest/Nature of Complainant's Interest

The second and third factors are often considered together. *Church of Scientology*, 700 F.2d at 494. "Under the second criterion a court would usually allow recovery of fees where the complainant was indigent or a nonprofit public interest group versus [sic] but would not if it was a large corporate interest (or a representative of such an interest)." *Id.* at 492 n. 6. "Under the third criterion a court would generally award fees if the complainant's interest in the information sought was scholarly or journalistic or public-interest oriented, but would not do so if his interest

was of a frivolous or purely commercial nature." *Id.*

Plaintiff received no commercial benefit from this action. As explained above, its interest in the information sought was of a public nature. It was not frivolous or purely commercial. The second and third factors weigh in favor of granting attorneys' fees.

### 3. Reasonable Basis for Refusal

The parties agree that this factor is not relevant to the determination of entitlement to fees, as Plaintiff did not challenge the applicability of exemptions or withholdings claimed by Defendant.

### 4. Entitlement to Award

Considering the above factors, as well as Defendant's stubbornness in refusing to conduct a reasonable search for the documents, the Court concludes that Plaintiff is entitled to an award of attorneys' fees and costs.

### C. Amount of Award

 "The plaintiff who has proven both eligibility for and entitlement to fees must submit his fee bill to the court for its scrutiny of the reasonableness of (a) the number of hours expended and (b) the hourly fee claimed. If these two figures are reasonable, then there is a strong presumption that their product, the lodestar figure, represents a reasonable award." *Long v. I.R.S.*, 932 F.2d 1309, 1313–14 (9th Cir.1991) (internal quotation omitted). "The court may authorize an upward or downward adjustment from the lodestar figure if certain factors relating to the nature and difficulty of the case overcome this strong presumption and indicate that such an adjustment is necessary." *Id.* at

1314; *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir.1975).[3]

Defendant initially objects to the amount of fees sought by Plaintiff because Defendant only produced 29 pages of documents responsive to Plaintiff's request. Thus, argues Defendant, Plaintiff's expenditures were out of proportion to the result obtained. The Court does not agree that the number of pages produced is the appropriate measure of Plaintiff's success in this litigation. First, Plaintiff prevailed in full by forcing Defendant to perform a search that complied with the requirements of FOIA. *See Cuneo v. Rumsfeld*, 553 F.2d 1360, 1364 (D.C.Cir.1977) (superseded on other grounds) (holding that FOIA "established a national policy of public disclosure of government information.") Second, the pages produced—though small in number—contained valuable information. To the extent the search was less fruitful than hoped, it only underscores the burden placed on Plaintiff by Defendant's failure to comply with FOIA. Defendant cannot put Plaintiff through the time and expense of enforcing compliance with FOIA and then complain that the resources expended were out of proportion to the good obtained. Reminding the Court of the waste of resources engendered by Defendant's failure to comply with its obligations hardly persuades the Court to reduce the fee award.

Defendant's objection that Plaintiff did not utilize attorneys familiar with the IRS and FOIA is not well-founded. (*See* Reply 11 (stating that an attorney familiar with IRS procedures was consulted); Decl. of Dean Hansell in Supp. of Pl. The L.A. Gay and Lesbian Cmty. Servs. Center's Mot. for Att'ys' Fees and Litig. Costs ¶ 1 (stating that counsel had previously participated in FOIA litigation); Supplemental Decl. of Heather L. Capell in Supp. of Pl. The Los Angeles Gay and Lesbian Cmty. Servs. Center's Reply to Opp'n to Pl.'s Mot. for Attorneys' Fees and Litigation Costs ¶ 3 (stating that counsel had participated in government searches and productions under FOIA).)

That brings the Court to the consideration of whether the time expended and hourly rates are reasonable. The Court agrees with Defendant that fees of nearly $300,000 for an action in which only two depositions were taken and one summary judgment motion was opposed, seem excessive. That, however, is due in part to the hourly rates charged by law firms everywhere (which always seem excessively high to those working in government, such as counsel for the Defendant—and the Court). Plaintiff's counsel did a better job than many firms in justifying its hourly rates—which appear to be on the high side of reasonable. Plaintiff's lead counsel states that he has reviewed the time entries and reduced or deleted those that were deemed excessive or duplicative. The Court applauds this effort. The Court, however, has done a further review having in mind that with such substantial hourly rates comes an expectation and requirement of a certain degree of skill, experience, and efficiency—in research, analysis, drafting, etc. Plaintiff's counsel has established the requisite degree of skill

**3.** The twelve factors identified by the Kerr court are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr*, 526 F.2d at 70.

and experience. A close review of the billings, however, indicates further adjustment is appropriate to account for duplication caused by the number of attorneys involved and excessive time spent on certain tasks. In approximately April 2007, several new attorneys were introduced to the case. In addition, there were numerous conferences and meetings between and among counsel to coordinate efforts.

The Court agrees with Defendant that this case was not particularly complex. Plaintiff isn't seeking an enhancement based on complexity, and the work billed—with the Court's additional reductions—appears to be reasonable for the level of complexity presented.

The Court also notes that a significant portion of the time entries are "block-billed"—a practice criticized in *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir.2007). In this case, block billing hindered the Court in analyzing to what extent the number of hours billed to a task, and the resulting fees charged for it, were appropriate. For example, each of the 22 entries from the first entry through September 25, 2006, contained some reference to the complaint: drafting, reviewing, revising, conferring about, etc. The total amount billed for all of these entries exceeds $11,000. This is excessive for "a short and plain statement," Fed.R.Civ.P. 8(a), and for the five-page document (containing only 15 substantive paragraphs) filed in this action. Inclusion of numerous other tasks (including preparation of a retainer agreement, which the Court does not consider an appropriate item to charge Defendant for) prevents the Court from determining precisely how much was actu-

ally charged for the complaint itself. Per the Ninth Circuit's instructions, the Court reduces the charges only for those entries that were block billed.[4] A 20% reduction, *See Welch*, 480 F.3d at 948, results in a reduction to the fee award of approximately $27,000.

Having made those reductions, the Court concludes that fees attributed to certain tasks are still excessive. As noted, the complaint was a relatively simple document (and appropriately so). Attorneys with this level of skill (and experience in FOIA matters) should reasonably have accomplished this task in substantially less time. The motion for summary judgment was barely 6 pages long and as simple a motion to oppose as the Court has seen. (In fact, the Court concluded it was likely to deny the motion before even reading the opposition.) Block billing again prevents the Court from accurately determining the fees charged to oppose the motion, but even a 20% reduction does not result in a reasonable fee based on the degree of skill and efficiency the Court expects from attorneys charging such hourly rates. The time entries reveal substantial overlap and duplication, as well as significant inefficiencies. Entries totaling more than $75,000 relate in whole or in part to the summary judgment motion.

Based on the Court's review of the services performed and its knowledge of the proceedings, its recognition of the substantial skill, reputation, and experience of the lawyers involved, and its conclusion that the rates are reasonable, the Court finds that the reasonable fee in this case is $240,000. The Court finds that counsel

---

**4.** Based on the survey cited in *Welch*, and a review of the actual entries, a reduction of between 10 and 30 % is appropriate. In fact, the Court chose not to reduce all block-billed entries, as many of them are reasonable on their face. The Court also did not reduce entries where the internal description contained a breakdown of the time spent on various tasks.

should be compensated for their costs in the amount of $2,256.10.

## III. CONCLUSION

Based on the foregoing, Plaintiff's Motion for Attorneys' Fees and Litigation Costs is GRANTED. Plaintiff is entitled to $240,000 in attorneys' fees and $2,256.10 in costs.

IT IS SO ORDERED.